1998 OK 65

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Sherry T. WALLACE, Respondent.**

SCBD 4248.

Supreme Court of Oklahoma.

June 30, 1998.

---

Allen J. Welch, Assistant General Counsel, Oklahoma Bar Ass'n, Oklahoma City, for Complainant.

Gloria Miller White, Edmond, and Richard W. Anderson, Oklahoma City, for Respondent.

OPALA, Justice.

¶1 In this disciplinary proceeding against a lawyer, the issues to be decided are, (1) Does the record submitted for our examination provide sufficient evidence for a meaningful *de novo* consideration of the complaint's disposition? [1] and (2) Is this respondent's misconduct, which occurred while she was acting in the capacity of a trustee, subject to discipline under any of the provisions of the rules of professional ethics? We answer both questions in the affirmative.

¶2 The Oklahoma Bar Association (the "Bar") commenced this disciplinary proceeding against Sherry T. Wallace ("Wallace" or "respondent"), a licensed lawyer, on 28 February 1997 by the filing of a formal complaint in accordance with the provisions of Rule 6 of the Rules Governing Disciplinary Proceedings ("RGDP").[2] The Bar charged Wallace with one count of misconduct, within which it alleged numerous violations of the provisions of the Oklahoma Rules of Professional Conduct ("ORPC")[3] and a single violation of the RGDP.

¶3 A hearing was held before a trial panel of the Professional Responsibility Tribunal (the "trial panel" and the "PRT," respectively) on 21 January 1998, at which the testimony of respondent and that of one character witness on her behalf was heard. In addition, the trial panel admitted in evidence a document jointly offered by the Bar and respondent (the "stipulations"), which contains agreed findings of fact and conclusions of law, agreed factors to be considered in mitigation of the charges, an agreed recommendation for discipline, and stipulated synopses of the testimony of several character witnesses.

¶4 The stipulations contain one-hundred fact stipulations covering the persons, entities, and events giving rise to this disciplinary proceeding. As part of the agreed conclusions of law, the Bar conceded that there were insufficient facts to support several of the violations alleged in the complaint, and assented to the dismissal of those charges.[4] For her part, respondent admitted to having violated ORPC Rules 1.7(a) and (b)[5] and 1.8(a) and (b).[6] Left unresolved by the par-

1. The record consists of the transcript of the hearing held before the Professional Responsibility Tribunal, the Report of the Professional Responsibility Tribunal, and a single exhibit admitted in evidence, consisting of a document that contains stipulated facts, agreed conclusions of law, agreed factors to be considered in mitigation of the charges, the stipulated testimony of character witness, and an agreed recommendation for discipline.

2. 5 O.S.1991, Ch. 1, App. 1–A. Rule 6.1 provides:

> "The proceeding shall be initiated by a formal complaint prepared by the General Counsel, approved by the Commission, signed by the chairman or vice-chairman of the Commission, and filed with the Chief Justice of the Supreme Court."

3. 5 O.S.1991, Ch. 1, App. 3–A.

4. The Bar's original complaint charged respondent with violating ORPC Rules 1.1, 1.2(a), 1.3, 1.4, 1.5(a), 1.6(a), 1.7, 1.8(a) and (b), 1.15, and 8.4(c), and RGDP Rule 1.4. Pursuant to the stipulation of the parties, all allegations were dismissed except those pertaining to the violation of ORPC Rules 1.7 and 1.8, and RGDP Rule 1.4.

5. Rule 1.7(a) and (b), 5 O.S.1991, Ch. 1, App. 3–A provides:

> **"Conflict of Interest: General Rule**
> (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
> (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
> (2) each client consents after consultation.
> (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyers's own interests, unless:
> (1) the lawyer reasonably believes the representation will not be adversely affected; and
> (2) the client consents after consultation.
> When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved."

6. Rule 1.8(a) and (b), 5 O.S.Supp.1997, Ch. 1, App. 3–A provides:

> **"Conflict of Interest; Prohibited Transactions**
> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
> (1) the transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed

ties' stipulations was whether respondent had violated RGDP Rule 1.4(b).[7] The trial panel ordered the parties to brief the dispute about the alleged Rule 1.4(b) violation. Having informed the parties that their agreed recommendation for discipline was not binding, the trial panel reserved to itself the prerogative of arriving at its own recommendation for discipline.

¶5 Following receipt of the parties' briefs and upon consideration of those briefs, the stipulations, and the testimony, the trial panel issued a report containing its findings of fact and conclusions of law together with a recommendation for discipline. In accord with the parties' stipulations, the PRT found that respondent had violated ORPC Rule 1.7(a) and (b), ORPC Rule 1.8(a) and (b), and, in addition, found that respondent had violated RGDP Rule 1.4(b). *Wallace denies there is clear and convincing evidence that she has violated RGDP Rule 1.4(b).* Rejecting the parties' agreed recommendation for a one-year suspension from the practice of law, the trial panel recommended instead that Wallace be *suspended* from the practice of law for a period of two years and required to pay the costs of this proceeding. Wallace urges that discipline should be imposed for the admitted ORPC violations *only* and that the

two-year suspension recommended by the trial panel is excessive. In her brief, respondent does not propose an alternative discipline to this court, but agrees (in the stipulations) that a suspension from the practice of law for a period of one year is appropriate.

I

**THE RECORD BEFORE THIS COURT PROVIDES SUFFICIENT EVIDENCE FOR A MEANINGFUL *DE NOVO* CONSIDERATION OF ALL FACTS RELEVANT TO THIS PROCEEDING**

¶6 In a bar disciplinary proceeding this court functions in the role of an adjudicative licensing authority that exercises exclusive original cognizance.[8] Its jurisdiction rests on the court's constitutionally vested, nondelegable power to regulate the practice of law, including the licensure, ethics, and discipline of legal practitioners in this state.[9] In deciding whether discipline is warranted and what sanction, if any, is to be imposed for the misconduct charged, this court conducts a full-scale, nondeferential, *de novo* examination of all relevant facts,[10] in which the recommendations of the trial panel

---

and transmitted in writing to the client in a manner which can be reasonably understood by the client;

(2) the client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3) the client consents in writing thereto.

(b) A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client consents after consultation, except as permitted or required by Rule 1.6 or Rule 3.3...."

7. Rule 1.4(b), 5 O.S.Supp.1997, Ch. 1, App. 1–A provides in pertinent part:

"Where money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose."

8. *State ex rel. Okl. Bar Ass'n v. Leigh*, 1996 OK 37, ¶11, 914 P.2d 661, 666; *State ex rel. Okl. Bar Ass'n v. Eakin*, 1995 OK 106, ¶8, 914 P.2d 644, 647; *State ex rel. Okl. Bar Ass'n v. Bolton*, 1994 OK 53, ¶15, 880 P.2d 339, 344; *State ex rel. Okl. Bar Ass'n v. Donnelly*, 1992 OK 164, ¶11, 848 P.2d 543, 545; *State ex rel. Okl. Bar Ass'n v. Raskin*, 1982 OK 39, ¶11, 642 P.2d 262, 265; *In*

re Integration of State Bar of Oklahoma, 185 Okl. 505, 95 P.2d 113, 115 (1939).

9. *Eakin, supra,* note 8 at ¶8, at 648; *State ex rel. Okl. Bar Ass'n v. Downing*, 1990 OK 102, ¶12, 804 P.2d 1120, 1122–1123; *Raskin, supra,* note 8 at ¶11, at 265–266.

10. *Leigh, supra,* note 8 at ¶11, at 666; *Eakin, supra,* note 8 at ¶8, at 647–648; *State ex rel. Okl. Bar Ass'n v. Lloyd*, 1990 OK 14, ¶8, 787 P.2d 855, 858; *State ex rel. Okl. Bar Ass'n v. Stubblefield*, 1988 OK 141, ¶7, 766 P.2d 979, 982; *State ex rel. Okl. Bar Ass'n v. Cantrell*, 1987 OK 17, ¶1, 734 P.2d 1292, 1293; *State ex rel. Okl. Bar Ass'n v. Foster*, 1969 OK 23, ¶——, 454 P.2d 654, 656; *State ex rel. Okl. Bar Ass'n v. Brandon*, 1969 OK 28, ¶5, 450 P.2d 824, 827. Because this court's cognizance of disciplinary proceedings cannot be shared with any other institution, every aspect of the Bar's adjudicative process must be revisited by our *de novo* consideration. This attribute of nondelegable jurisdiction serves to distinguish the conduct of bar disciplinary functions from trial *de novo*—a retrial in a different court—or even from *de novo* appellate review on the record, which stands for an independent, non-deferential examination *of another tribunal's record.*

are neither binding nor persuasive.[11] We are not guided here by the scope-of-review rules applicable in the context of corrective relief on appeal or certiorari, in which context we may have to leave undisturbed another tribunal's findings of fact.[12]

■ ¶ 7 The court's duty can be discharged only if the trial panel submits to us a complete record of the proceedings.[13] Our initial task is to ascertain whether the tendered record is sufficient to permit (a) an independent determination of the facts and (b) the crafting of appropriate discipline. The latter is that which (1) is consistent with the discipline imposed upon other lawyers who have committed similar acts of professional misconduct and (2) avoids the vice of visiting disparate treatment on the respondent-lawyer.[14]

¶ 8 We have carefully scrutinized the record submitted to us in this proceeding and conclude that it is adequate for our *de novo* consideration of respondent's alleged professional misconduct.

## II

## THE EVIDENCE IS NOT CLEAR AND CONVINCING THAT RESPONDENT VIOLATED RGDP RULE 1.4(b)

¶ 9 The charges against respondent arise from her handling of the Rhonda K. Smith Irrevocable Trust. Respondent's professional relationship with Rhonda K. Smith ("Smith") began in late spring or early summer of 1992, approximately one year prior to the settlement of the trust. Respondent at that time represented Smith in connection with an investigation into Smith's possible involvement in certain criminal activities for which Smith's husband had been arrested. While her husband was in jail, Smith asked respondent to represent her in a divorce action, but before the divorce papers could be served on Mr. Smith, he committed suicide, leaving his wife as the beneficiary of a life insurance policy worth $1,294,000. Following her husband's suicide, Smith asked respondent to represent her in legal matters arising from her deceased husband's business and to assist her in obtaining the proceeds of life insurance. Smith and respondent were in daily contact about all of these matters.

¶ 10 At this time, Smith also approached respondent about creating a trust to be funded with the life insurance proceeds. Respondent declined, referring Smith to another attorney more experienced in the field of trusts. Respondent did agree, at Smith's request, to serve as trustee of the proposed trust, for which she was to be paid a monthly fee of $2,500.00. In February 1993, the Rhonda K. Smith Irrevocable Trust (the "trust") came into existence, and in March 1993, it was funded with $600,000 of the life insurance proceeds.[15] The trust instrument

11. *Eakin, supra,* note 8 at ¶ 8, at 648; *Raskin, supra,* note 8 at ¶ 11, at 265. The court's range of options in a disciplinary proceeding is set forth in Rule 6.15(a), RGDP, 5 O.S.1991, Ch. 1, App. 1–A:
    "The Supreme Court may approve the Trial Panel's findings of fact or make its own independent findings, impose discipline, dismiss the proceedings or take such other action as it deems appropriate."

12. *Bolton, supra,* note 8 at ¶ 15, at 344; *Eakin, supra,* note 8 at ¶ 8, at 648; *State ex rel. Okl. Bar Ass'n v. Farrant,* 1994 OK 13, ¶ 7, 867 P.2d 1279, 1284; *Levi v. Mississippi State Bar,* 436 So.2d 781, 782 (Miss.1983).

13. *RGDP, supra,* note 2, Rule 6.13 provides in part:
    "Within thirty (30) days after the conclusion of the hearing, the Trial Panel shall file with the Clerk of the Supreme Court a written report which shall contain the Trial Panel's findings of fact on all pertinent issues and conclu-

sions of law (including a recommendation as to discipline, if such is found to be indicated, and a recommendation as to whether the costs of the investigation, record and proceedings should be imposed on the respondent), and shall be accompanied by all pleadings, a transcript of the proceeding, and all exhibits offered thereat. . . ."

14. *Eakin, supra,* note 8 at ¶ 9, at 648; *Bolton, supra,* note 8 at ¶ 16, at 345; *State ex rel. Okl. Bar Ass'n v. Perceful,* 1990 OK 72, ¶ 5, 796 P.2d 627, 630.

15. Originally, the plan was to set up two trusts, one revocable and one irrevocable, with the irrevocable trust to be funded with one million dollars of the insurance proceeds. Before that could occur, Smith spent $700,000. Among her purchases were a home and "two corvettes when one was lost." (sic) Respondent was asked how a Corvette could be lost. She explained that Smith had bought a Corvette for her boyfriend.

is not included in the record of this proceeding, but the stipulations recite that respondent was given "very broad authority" as trustee.

¶ 11 Upon receipt of the insurance proceeds, respondent, as trustee, placed the funds with an investment firm, which made all investment decisions with regard to the funds. Two months later, in May 1993, respondent moved the funds to another investment firm, which then made the investment decisions for the funds. During this time, between March and June 1993, Smith made several requests of respondent to give her cash out of the trust funds, and it appears that respondent gave her approximately $80,000.

¶ 12 In May 1993, respondent was approached by Clark Boyles ("Boyles"), President and Chief Executive Officer of Harris Packing, Inc. ("Harris Packing"), about making a loan from the trust to Harris Packing. Concerned with the rate at which Smith was spending money, respondent wanted to find a higher rate of return on the trust's investments, and was willing to consider Boyles' offer. She discussed the possibility of making the loan with an investment counselor at the investment firm then handling the trust's funds and also did some independent investigating and analysis of Harris Packing's viability as an investment.[16]

¶ 13 One of Boyles' employees was a man named Edward Reed ("Reed"). Respondent knew Reed from years earlier when she and Reed shared a law office with two other lawyers. During that time Reed was involved in a disciplinary proceeding, which resulted in his resignation from the Bar.[17]

The disciplinary proceeding involved allegations of conversion and misappropriation of trust funds. Subsequently, Reed pled guilty to federal and state criminal charges of fraud in connection with the misconduct that was the subject of the disciplinary proceeding.[18] Respondent claims that she was aware only of the "general nature" of the allegations underlying Reed's Bar discipline and criminal problems, but that she knew nothing specific about them.

¶ 14 In August 1993, Reed left his employment with Harris Packing to start his own factoring business. The company, known as Financial Funding Group, L.C. ("FFG"), was formed in September 1993. Respondent's mother joined Reed in this venture, contributing to the company's capitalization as well as taking on some managerial duties with the company. Respondent provided organizational legal services to FFG, and is listed in its articles of incorporation as the sole organizer and registered agent for the company. Reed was to receive a monthly income of $4,000 and respondent's mother was to receive a monthly income of $1,000.

¶ 15 FFG subleased office space from respondent, initially paying $500 per month in rent. Later, when FFG began utilizing additional space and services, the rent increased to $1,500 per month. In ten months, from September 1993 through June 1994, FFG paid respondent a total of $10,000 in rent for the office space. During the course of FFG's sublease of her office, Reed installed a new telephone system in respondent's office, costing over $2,000, and a new copier machine, costing approximately $4,000, of which re-

He was arrested driving the Corvette while in possession of cocaine. When the police seized the Corvette, Smith bought him a second one. In any event, the revocable trust was never funded, and the irrevocable trust involved here was funded with less than was originally intended.

16. Respondent decided to make two loans to Harris Packing. On 10 May 1993, respondent lent Harris Packing $250,000 of trust funds, and then, on 12 July 1993, at Boyles' request after satisfying herself that the additional loan would be properly secured, she lent Harris Packing another $50,000. In August 1993, respondent's mother also made two short term loans to Harris Packing totaling $40,000.

17. *See, State ex rel. Okl. Bar Ass'n v. Reed,* 1990 OK 128, 804 P.2d 446.

18. Between January 1992 and April 1993, Reed spent time in federal and state prisons as well as in a federal halfway house. Prior to his resignation from the Bar, Reed had represented Boyles, and after Reed was released from federal prison to the halfway house and again after he was released from a two-month stint in state prison in April 1993, Reed was employed by Boyles at Harris Packing.

spondent ended up paying $2,700 after FFG vacated the office in July 1994. Respondent did not have any involvement in FFG's daily operations, nor did she have access to its books and records or authority to access its bank account. She had no ownership interest in FFG, but she and her mother both lent money to the company in its final months of operation.

¶ 16 According to the stipulations, respondent's observations of Reed's activities in the office led her to believe that he was working assiduously to build the company, so that when Reed approached her to borrow funds from the trust, she agreed to consider the request.

¶ 17 In September 1993, Boyles informed respondent that Harris Packing would not be able to meet its loan payments to the trust. Respondent decided to assign to FFG the trust's right to collect from Harris Packing. Apparently, Harris Packing was also unable to make loan repayments to respondent's mother, who also proceeded to assign to FFG her right to collect from Harris Packing. Harris Packing agreed to reimburse the trust for the legal work involved in the assignment to FFG of the trust's right to collect, and the stipulations recite that FFG received two checks in October 1993 from Harris Packing totaling $7,509.60, of which all but $9.60 was paid to respondent "as attorney fees from Harris." Additionally in October 1993, respondent executed on behalf of FFG as its "attorney-in-fact," a forbearance agreement relating to collection efforts on the Harris Packing loan to the trust.

¶ 18 In September 1993, having considered Reed's request for a loan, respondent agreed to lend FFG from the trust $50,000.[19] This was the first of many loans by respondent to FFG from the trust. Over the next eleven months, respondent lent trust funds to FFG totaling approximately $165,000. On the very date of each loan, or within days afterward, respondent received payments from FFG for its various obligations to her for rent on the office space or for an attorney's fee. Payments to respondent's mother for salary, and in one instance, repayment of a loan to her, also coincided with respondent's lending of trust funds to FFG.

■ ¶ 19 The trial panel found that "the payments to Respondent from FFG, or to her mother, were a *quid pro quo* to Respondent for the loan of the trust funds to FFG" in violation of RGDP Rule 1.4(b). We view the finding as unsupported by the required standard of clear and convincing proof.

¶ 20 The trial panel's analysis focused exclusively on the timing of the loans from the trust to FFG and payments from FFG to respondent and her mother, without considering FFG's receipt of income from other sources. Looking at the evidence in the limited manner utilized by the trial panel, it is easy to see how the trial panel arrived at its view that the pattern of loans and payments was a *quid pro quo*. This court has looked at the loans and payments together with the receipt by FFG of other income and has found that with the exception of the first loan to FFG from the trust, FFG had sufficient other income to make the payments to respondent and her mother without resorting to the trust's funds for the payments.[20] Con-

19. The timing of this loan, barely nine days after the company was officially formed and at most a few weeks to perhaps a month after Reed would have moved into her office, suggests that respondent's confidence in Reed, ostensibly based on her observations of his work habits, developed rather hastily.

20. For example, the trial panel in its report shows that on 13 January 1994, the Trust lent $50,000 to FFG and on that same day, FFG paid $3,000 to Respondent on the Harris Packing note, $2,461.67 towards "interest payments", and $10,850 to respondent's mother as "payment in full." This amounts to $16,311.67. The trial panel ignores the fact that by 13 January 1994, FFG had collected from Harris Packing over

$16,000 and had received investment income of over $5,000, more than enough to cover its payments to respondent and her mother. In another instance, the trial panel points to the 31 March 1994 loan of $18,000 to FFG with payments of rent and an attorney's fee to respondent on that day totaling $6,500. The trial panel takes no note of the receipt by FFG during the month of March of over $13,000 in investment income.

Another possible analytical approach to the relationship of loans and payments in this proceeding is to consider whether over its lifetime FFG had sufficient income from sources other than the trust to pay respondent and her mother. The loans to FFG, totaling $165,000, amounted

sidered in this light, *we do not find clear and convincing evidence* of a *quid pro quo* pattern which would compel our conclusion that respondent lent the money to FFG for the impermissible purpose of personal gain.

## III

### RESPONDENT'S MISHANDLING OF THE TRUST CONSTITUTES A VIOLATION OF RGDP RULE 1.3

■ ¶ 21 The lack of clear and convincing evidence that respondent misapplied trust funds in violation of RGDP Rule 1.4 does not mean that her conduct does not warrant discipline on some other grounds. In this court's view, respondent's mishandling of the funds placed in her care as trustee violates RGDP Rule 1.3.[21]

■ ¶ 22 A trustee is a fiduciary of the highest order in whom the hope and confidence of the settlor are placed with the expectation that the trustee will exercise the obligations of the office for the exclusive benefit of the *cesnui que trust.*[22] A trustee always owes to the *cestui que trust uberrima fides.*[23] When a legal practitioner occupies the position of trustee and breaches that fiduciary obligation through mismanagement of the trust, that practitioner brings the legal profession into disrepute and, as a result, subjects himself to bar discipline. Strong and unswerving commitment to the value of fiduciary loyalty is a *sine qua non* of the personal characteristics lawyers must have.[24]

¶ 23 Respondent had a personal and professional interest in the success of FFG. Her course of dealing with Reed and others demonstrates an excessive entanglement, productive of conflicts of interest, making total loyalty to the *cestui que trust* well-nigh impossible. This divided loyalty resulted in respondent making a series of "start-up" loans to a newly formed company with no track record for rewarding investors, which was owned and operated by an individual known to her to be of questionable repute. She obtained no security for the loans and failed to obtain personal guarantees from the principals of FFG. It is impossible to discern in this pattern of investment the presence of that loyalty to the *cestui que trust* which is obligatory for a trustee. We hold that respondent's failure to act in accordance with the prescribed standards of conduct mandated for a trustee violates RGDP Rule 1.3 and warrants the imposition of bar discipline.

## IV

### RESPONDENT VIOLATED ORPC RULES 1.7(a) and (b) AND 1.8(a) and (b)

¶ 24 In the stipulated conclusions of law, respondent agreed that she had violated ORPC Rules 1.7(a) and (b) and 1.8(a) and (b).

---

to approximately fifty-five percent of the $304,000 that FFG took in during its operation. Respondent received approximately $10,000 in rent and $7,600 as attorney's fees. Respondents mother received $3,000 in salary and $10,850 as the repayment of a loan. Respondent also received approximately $3,500 worth of "in-kind" benefits from FFG in the form of a new telephone system and copier for her office. This amounts to approximately $30,000 in cash or benefits received by respondent and her mother from FFG, well short of the $139,000 FFG took in from sources other than the trust.

21. *RGDP, supra,* note 2, at Rule 1.3. Rule 1.3 states in pertinent part:
   "**Discipline for acts contrary to prescribed standards of conduct**
   The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal

profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all...."

22. *First National Bank of Wichita Falls v. Stricklin,* 1959 OK 208, 347 P.2d 652.

23. BLACK'S LAW DICTIONARY 1690 (Revised 4th ed. 1968) translates *uberrima fides* as "the most abundant good faith, absolute and perfect candor or openness and honesty."

24. *Mailath v. State ex rel. Okl. Bd. of Bar Examiners,* 1988 OK 19, ¶ 44, 752 P.2d 803, 812, in which this court quoted approvingly from *Sodikoff v. State Bar of California,* 14 Cal.3d 422, 121 Cal.Rptr. 467, 471, 535 P.2d 331, 335 (1975): "When an attorney assumes a fiduciary relationship and violates his duty in a manner that would justify disciplinary action if the relationship had been that of attorney and client, he may properly be disciplined for his misconduct."

Having reviewed the evidence, the court finds no reason unilaterally and *sua sponte* to relieve respondent of the impact and legal effect of her stipulations. We hence accept her admission of wrongdoing and proceed to consider the appropriate disciplinary sanction for respondent's acts of professional misconduct.

## V

### CIRCUMSTANCES TO BE CONSIDERED IN MITIGATION OF THE CHARGES

¶ 25 The stipulations set forth three items for this court's consideration as matters in mitigation of the charges: (1) respondent had been a practising lawyer for only five years prior to the misconduct; (2) respondent had not been disciplined by the Bar or by this court prior to the misconduct; and (3) before a Bar complaint had been filed, respondent attempted at great personal expense to reduce the disastrous financial consequences of her mismanagement of the trust by borrowing $50,000 from a family member and applying it as a principal reduction payment on FFG's debt to the trust.

¶ 26 In addition to the agreed factors in mitigation, evidence of respondent's good character was presented in the form of testimony at the PRT hearing by Virgil C. Black, an Oklahoma County district judge, and by the stipulated synopses of testimony of six character witnesses, including an Oklahoma County special judge, two lawyers licensed to practice in Oklahoma, and an Edmond Public Schools teacher. Each attested to respondent's honesty and integrity.

¶ 27 Finally, we take note of the fact, introduced by the Assistant General Counsel for the Bar at the end of the PRT hearing, that respondent and her lawyers cooperated fully with the Bar in the investigation of the grievance and throughout the course of the resulting disciplinary proceeding.

## VI

### RESPONDENT'S MISCONDUCT WARRANTS THE IMPOSITION OF A TWO–YEAR SUSPENSION FROM THE PRACTICE OF LAW TOGETHER WITH THE PAYMENT OF THE COSTS OF THIS PROCEEDING

¶ 28 The preamble to the ORPC states, "[a] lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice." These relationships entail responsibilities, many of which are prescribed by the Rules of Professional Conduct. A lawyer's misconduct adversely reflects on the entire legal profession, evidencing a lack of commitment to the lawyer's client and a disregard for the court's expectations and the ideals of the profession.[25] Neglect or violation of a lawyer's responsibilities compromises the independence of the profession and the public interest which that independence serves.[26]

¶ 29 The object of a disciplinary proceeding is not to punish, but rather to evaluate a lawyer's continued fitness to practice law in light of this court's obligation to safeguard the interest of the public, of the judiciary, and of the legal profession.[27] A license to practice law is not conferred for the benefit of an individual, but for that of the public. In discharging this court's responsibility to discipline lawyers, we act primarily for the welfare of the public and in the interest of ensuring the proper administration of judicial or legal process.[28]

¶ 30 Respondent's conduct warrants discipline not for punishment's sake, but in the interest of assuring the integrity of the legal profession and deterring others from engaging in similar acts of misconduct.

25. *Leigh, supra,* note 8 at ¶ 14, at 667.

26. *ORPC, supra,* note 3, Preamble.

27. *Bolton, supra,* note 8 at ¶ 12, at 602; *Donnelly, supra,* note 8 at ¶ 14, at 546; *State ex rel. Okl. Bar Ass'n v. Colston,* 1989 OK 74, ¶ 20, 777 P.2d 920, 925; *State ex rel. Okl. Bar Ass'n v. Moss,* 1983 OK 104, ¶ 12, 682 P.2d 205, 207.

28. *State ex rel. Okl. Bar Ass'n v. Smith,* 1980 OK 175, ¶ 21, 615 P.2d 1014, 1018; *State ex rel. Okl. Bar Ass'n v. Lowe,* 1982 OK 20, ¶ 19, 640 P.2d 1361, 1362.

Respondent's admitted violations, involving conflict of interest and business dealings with a client, and the additional violation found from the record by the court (which consists of respondent's failure to adhere to the fiduciary standard of conduct obligatory on a trustee) are serious offenses. Considered together, they all reflect, at a minimum a misunderstanding and, at worst, a disregard of a lawyer's fundamental duty of loyalty to one's client.

¶ 31 In mitigation, respondent's willingness to assume responsibility for her wrongdoing even before the situation was brought to the Bar's attention, the evidence that those who know her well think highly of her personal honesty and integrity, and respondent's complete cooperation with the Bar in this proceeding convince us that respondent is likely to learn from this experience and become an ethically fit lawyer.

## VII

### SUMMARY

¶ 32 This disciplinary proceeding yielded clear and convincing evidence that respondent violated ORPC Rules 7.1(a) and (b) and 8.1(a) and (b) and RGDP Rule 1.3. The severity of the sanction for professional misconduct depends upon all the circumstances, including the wilfulness and seriousness of the violations, the respondent's willingness to acknowledge the seriousness of the wrongdoing and to take responsibility for it, and the degree of cooperation the respondent demonstrates in the investigation and resolution of the grievances. Upon *de novo* review, *the court finds clear and convincing evidence that respondent committed the violations discussed in this opinion. Following the PRT's recommendation for discipline,* the court concludes that respondent's suspension from the practice of law for two years and an order for her to pay the costs of this proceeding in the sum of $878.55 is the appropriate discipline to be imposed.

¶ 33 RESPONDENT IS ORDERED SUSPENDED FROM THE PRACTICE OF LAW FOR A PERIOD OF TWO YEARS AND DIRECTED TO PAY THE COSTS OF THIS PROCEEDING, WHICH SHALL BE DUE NOT LATER THAN NINETY DAYS AFTER THIS OPINION BECOMES FINAL.

¶ 34 **All Justices Concur.**

