1998 OK 103

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**J. Michael BUSCH, Respondent.**

No. 4234.

Supreme Court of Oklahoma.

Oct. 13, 1998.

As Corrected May 18, 1999.

Allen Welch, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, for Complainant.

Thomas C. Lane, Sapulpa, for Respondent.

OPALA, J.

¶1 In this disciplinary proceeding against a lawyer, the issues to be decided are: (1) Does the record submitted for our examination provide sufficient evidence for a meaningful *de novo* consideration of the complaint's disposition?[1] and (2) Is disbarment (with imposition of costs) an appropriate disciplinary sanction for respondent's breach of professional ethics? We answer both questions in the affirmative.

¶2 The Oklahoma Bar Association [Bar] charged J. Michael Busch [Busch or respondent], a licensed lawyer, with two counts of professional misconduct. After a hearing, a trial panel of the Professional Responsibility Tribunal [panel or PRT] issued a report containing its findings of fact and conclusions of law, together with a recommendation of discipline. PRT found that respondent had violated numerous provisions of the Oklahoma Rules of Professional Conduct [ORPC][2] and of the Rules Governing Disciplinary Proceedings [RGDP].[3] It recommended that Busch stand *disbarred* and be required to pay the costs of this proceeding. Busch denies that (a) there is clear and convincing evidence of his alleged violations and (b) his conduct warrants imposition of any sanctions.

I

**INTRODUCTION TO THE RECORD**

¶3 This bar disciplinary proceeding was commenced on 26 December 1996 by the filing of the Bar's complaint in accordance with the provisions of RGDP Rule 6.[4] The

1. The record consists of the pretrial order, answer to interrogatories, transcript of the hearing held before the Professional Responsibility Tribunal, exhibits offered by both parties and admitted in evidence at that hearing and exhibits offered by respondent which were excluded by the tribunal but preserved for review by an offer of proof, and the Report of the Professional Responsibility Tribunal.

2. 5 O.S.1991, Ch. 1, App. 3–A.

3. 5 O.S.1991, Ch. 1, App. 1–A.

4. *Id.* at Rule 6.1.

complaint consists of two counts, each organized around allegations of Busch's professional misconduct toward an individual grievant, and each alleging multiple violations of the ORPC [5] and of the RGDP. The hearing on the complaint began on 8 October 1997. It spans five days of testimony adduced over a period of five months.[6] Our disposition of this case has called for careful examination of voluminous materials. The record comprises over eleven hundred pages of transcripts and documentary exhibits in excess of one hundred items.[7]

■ ¶ 4 Upon the conclusion of hearings, the panel found *clear and convincing evidence* to support both counts.[8] As set forth below, we adopt many, but not all, of PRT's findings of facts and conclusions of law and endorse its recommendation of discipline. The seriousness of the violations and respondent's unwillingness to acknowledge any wrongdoing warrant his disbarment.

## II

## THE RECORD BEFORE THIS COURT PROVIDES SUFFICIENT EVIDENCE FOR A MEANINGFUL *DE NOVO* CONSIDERATION OF ALL FACTS RELEVANT TO THIS PROCEEDING

■ ¶ 5 In a bar disciplinary proceeding this court functions in an adjudicative capacity as a licensing authority vested with exclusive original jurisdiction.[9] Its cognizance rests on constitutionally invested, nondelegable power to regulate the practice of law, which includes the licensure, ethics, and discipline of legal practitioners in this state.[10] Before deciding whether discipline is warranted and what sanction, if any, is to be imposed for the misconduct alleged, this court conducts a full-scale, nondeferential, *de novo* examination of all relevant facts,[11] in the course of which the recommendations of the trial panel are neither binding nor persuasive.[12] We are not guided by the standard-of-review criteria applicable in the context of corrective relief on appeal or on certiorari, in which we may be compelled to leave undisturbed another tribunal's findings of fact.[13]

---

5. 5 O.S.1991, Ch. 1, App. 3–A. ORPC superseded the Code of Professional Responsibility, 5 O.S. 1981, Ch. 1, App. 3, effective as of 1 July 1988.

6. The second day of testimony took place on 9 October 1997, the third on 24 November 1997, the fourth on 23 December 1997, and the fifth on 17 February 1998. The delay was occasioned by scheduling conflicts and health problems of both respondent and his attorney.

7. The exhibits include various correspondence between both grievants and respondent throughout their attorney-client relationship.

8. The terms of RGDP Rule 6.12(c) provide:
   "(c) To warrant a finding against the respondent in a contested case, the charge or charges must be established by clear and convincing evidence, and at least two of the members of the Trial Panel must concur in the findings."
   Before this court may impose discipline upon a legal practitioner, clear and convincing evidence must show that the lawyer has committed the violations alleged. *State ex rel. Okl. Bar Ass'n v. Kessler*, 1995 OK 32, ¶ 23, 895 P.2d 713, 718; *State ex rel Okl. Bar Ass'n v. Downing*, 1993 OK 44, ¶ 11, 863 P.2d 1111, 1112; *State ex rel Okl. Bar Ass'n v. Colston*, 1989 OK 74, ¶ 14, 777 P.2d 920, 923.

9. *State ex rel. Okl. Bar Ass'n v. Leigh*, 1996 OK 37, ¶ 11, 914 P.2d 661, 666; *State ex rel. Okl. Bar Ass'n v. Eakin*, 1995 OK 106, ¶ 8, 914 P.2d 644, 647; *State ex rel. Okl. Bar Ass'n v. Bolton*, 1994

OK 53, ¶ 15, 880 P.2d 339, 344; *State ex rel. Okl. Bar Ass'n v. Donnelly*, 1992 OK 164, ¶ 11, 848 P.2d 543, 545; *State ex rel. Okl. Bar Ass'n v. Raskin*, 1982 OK 39, ¶ 11, 642 P.2d 262, 265; *In re Integration of State Bar of Oklahoma*, 185 Okl. 505, 95 P.2d 113, 115 (1939).

10. *Eakin, supra* note 9, at ¶ 8, at 648; *State ex rel. Okl. Bar Ass'n v. Downing*, 1990 OK 102, ¶ 12, 804 P.2d 1120, 1122–1123; *Raskin, supra* note 9, at ¶ 11, at 265–266.

11. *Leigh, supra* note 9, at ¶ 11, at 666; *Eakin, supra* note 9, at ¶ 8, at 647–648; *State ex rel. Okl. Bar Ass'n v. Lloyd*, 1990 OK 14, ¶ 8, 787 P.2d 855, 858; *State ex rel. Okl. Bar Ass'n v. Stubblefield*, 1988 OK 141, ¶ 7, 766 P.2d 979, 982; *State ex rel. Okl. Bar Ass'n v. Cantrell*, 1987 OK 17, ¶ 1, 734 P.2d 1292, 1293; *State ex rel. Okl. Bar Ass'n v. Brandon*, 1969 OK 28, ¶ 5, 450 P.2d 824, 827.

12. *Eakin, supra* note 9, at ¶ 8, at 648; *Raskin, supra* note 9, at ¶ 11, at 265. The court's range of options in a disciplinary proceeding is set forth in RGDP Rule 6.15(a):
    "(a) The Supreme Court may approve the Trial Panel's findings of fact or make its own independent findings, impose discipline, dismiss the proceedings or take such other action as it deems appropriate."

13. *Bolton, supra* note 9, at ¶ 15, at 344; *Eakin, supra* note 9, at ¶ 8, at 648; *State ex rel. Okl. Bar*

¶6 The court's duty can be discharged *only* *if* the trial panel submits a complete record of the proceedings.[14] Our initial task is to ascertain whether the record is sufficient to permit (a) an independent determination of the critical facts and (b) the crafting of appropriate discipline. The latter is that which (1) is consistent with the discipline imposed upon other lawyers who have committed similar acts of professional misconduct and (2) avoids the vice of visiting disparate treatment on the respondent-lawyer.[15]

¶7 We have carefully scrutinized the extensive record and conclude that it is adequate for this court's *de novo* consideration of respondent's professional misconduct in contest.

## III

## *DE NOVO* ANALYSIS AND CONSIDERATION OF PRT'S EVIDENTIARY RULINGS

¶8 PRT rejected the testimony of two witnesses[16] as well as several exhibits proffered by respondent. Its ruling rests on the conclusion that neither the tendered witnesses' names nor the exhibits were submitted *before the PRT deadline* for identification of documentary and testimonial evidence intended to be offered in the hearings.[17]

¶9 Respondent argues that the exclusion of this critical proof has denied him a fair and impartial hearing in conformity to the standards of due process and to the RGDP rules. According to him, this court's *de novo* review cannot be conducted without an examination of the complete record. The excluded evidence, respondent reasons, is crucial where, as here, he alone "rebuts the allegations of disgruntled former clients." Respondent claims that the documentary and

---

*Ass'n v. Farrant,* 1994 OK 13, ¶7, 867 P.2d 1279, 1284; *Levi v. Mississippi State Bar,* 436 So.2d 781, 782 (Miss.1983).

14. The terms of RGDP Rule 6.13 provide in part:
"Within thirty (30) days after the conclusion of the hearing, the Trial Panel shall file with the Clerk of the Supreme Court a written report which shall contain the Trial Panel's findings of fact on all pertinent issues and conclusions of law (including a recommendation as to discipline, if such is found to be indicated, and a recommendation as to whether the costs of the investigation, record and proceedings should be imposed on the respondent), and shall be accompanied by all pleadings, a transcript of the proceeding, and all exhibits offered thereat...."

15. *Eakin, supra* note 9, at ¶9, at 648; *Bolton, supra* note 9, at ¶16, at 345; *State ex rel. Okl. Bar Ass'n v. Perceful,* 1990 OK 72, ¶5, 796 P.2d 627, 630.

16. At the beginning of the 8 October 1997 hearing, respondent orally pressed that two witnesses be included—Hondo Smith (Busch's office manager) and Nellie Rine (a paralegal), Appendix C *infra*. The PRT refused to hear the tendered witnesses because the request came too late. (PRT order of 8 October 1997). It was made *six months* after the deadline set in the scheduling order of 27 March 1997. Respondent's list of witnesses and documentary evidence, submitted 11 April 1997, did not include the two names

(Smith and Rine). The PRT on 24 October 1997 denied respondent's mid-trial application (of 20 October 1997) to include the testimony of the two witnesses. According to respondent's brief, these witnesses had previously been identified to the complainant, but their names were *"inadvertently"* dropped from the pretrial order. (Respondent's brief, page 10). The excluded testimony of the tendered witnesses, respondent claims, is critical to support his medical expert's conclusion about his derelictions alleged in the Bar complaint.

17. Although *both parties concede* that the two names were not timely tendered for listing as respondent's witnesses (Respondent's brief, page 10, Complainant's reply brief, pages 6–9), for some *unexplained* reason the names appear on a 8 October 1997 order. Because respondent does not contest the panel's position that he had failed to submit the names of these two witnesses before the PRT deadline for identification of documentary and testimonial evidence intended to be offered in the hearings, we deem the concession in respondent's brief to serve as an admission and supply for the record what it fails clearly to set forth. Admissions made in the briefs may be considered as supplementing and curing an otherwise deficient appellate record. *Strelecki v. Oklahoma Tax Com'n,* 1993 OK 122, ¶16, 872 P.2d 910, 918; *Reeves v. Agee,* 1989 OK 25, ¶24, 769 P.2d 745, 753–754; *Womack v. City of Oklahoma City,* 1986 OK 14, ¶10, 726 P.2d 1178, 1181; *Timmons v. Royal Globe Ins. Co.,* 1985 OK 76, ¶8, 713 P.2d 589, 592 n. 10.

testimonial evidence should have been admitted (a) on his direct examination to bolster both his credibility and the weight of the evidence *as well as* (b) on cross examination of his former clients for purposes of impeachment. Its exclusion, he asserts, was an abuse of discretion. While the evidentiary rules operate as a shield to protect opposing parties from surprise and to facilitate the disciplinary process, respondent urges, they should not be used as a sword to sap crucial evidence from a party's case. Because the hearings were conducted over a period of several months,[18] respondent argues, the record's enlargement after the first two days of testimony would not have inconvenienced either the Bar or PRT. Respondent explains that the two witnesses whose names were not timely tendered had been identified to the Bar earlier but were later "inadvertently" dropped from the pretrial order.

¶ 10  Respondent appears to excuse his failure timely to submit the testimonial and documentary evidence either by inadvertence or by ambiguity in the disciplinary rules. In his brief respondent argues (a) there is nothing in the RGDP which requires either a pretrial order or strict adherence to its terms and (b) the RGDP is "ambiguous" as to what

**18.**  See *supra* note 6 for the hearing dates of the 5–day PRT evidentiary proceeding.

**19.**  The pertinent terms of *Rule 5, Rules for the* District Courts, 12 O.S.1991, Ch. 2, App., are: " * * * I. Pretrial Orders. After any conference held pursuant to this rule, an order shall be entered reciting the action taken. This order shall control subsequent course of the action unless modified by a subsequent order. The order following a final pretrial conference shall be modified only to prevent manifest injustice. The form adopted by the Oklahoma Supreme Court for pretrial conference orders shall be used by the District Court. If the judge deviates from the form, he or she shall in writing show to the Supreme Court the reasons for such deviation.
   The pretrial order shall include the results of the conference and advice to the court regarding the factual and legal issues, including details of material evidence to be presented. The order shall also present all questions of law in the case. All exhibits must be marked, listed and identified in the pretrial order. If there is objection to the admission of any exhibits, the grounds for the objection must be specifically stated...."

**20.**  The pertinent terms of Rule 5(G), Rules for the District Courts, 12 O.S.1991, Ch. 2, App., are:

discretion PRT has to exclude evidence on *technical grounds.* According to respondent, a PRT pretrial order may describe broadly large categories of evidence without giving a detailed list of particular testimony and documentary items. For this notion respondent cites Rule 5, Rules for the District Courts.[19]

¶ 11  The Bar disagrees that District Court Rule 5 allows imprecise reference to documentary and testimonial evidence. We are directed to the terms of Rule 5(G) and (I), which explicitly require the parties *to identify* witnesses and documents[20] and provide that "all exhibits ... be marked, listed and identified in the pretrial order".[21]

### The Orderly Conduct of Disciplinary Proceedings

¶ 12  Generally, the rules in civil proceedings govern disciplinary proceedings and the reception of evidence.[22] Trials must be orderly whether conducted by a trial judge, a hearing examiner or a panel. PRT functions in disciplinary proceedings as this court's hearing examiner. It has the power to enforce orderly procedure, which requires the parties to provide pretrial identification of proof.[23]

" G. Subjects to be Discussed at Pretrial Conferences. In accordance with the objectives of a pretrial conference, the participants under this rule should have taken action to:

\*　　\*　　+　　\*　　\*　　\*

5. the *identification of witnesses and documents*, the need and schedule for filing and exchanging pretrial briefs, and the date or dates for further conferences and for trial; * * * " (Emphasis supplied.)

**21.**  See Rule 5(I), *supra* note 19.

**22.**  The terms of RGDP Rule 6.12(a) are:
   "(a) So far as practicable, the disciplinary proceedings and the reception of evidence shall be governed generally by the rules in civil proceedings, except as otherwise herein provided; the respondent shall be entitled to be represented by counsel."
   *See also Matter of McConnel*, 1994 OK 107, ¶ 14, 886 P.2d 471, 474; *State ex rel. Oklahoma Bar Ass'n v. Perkins*, 1988 OK 65, ¶ 18, 757 P.2d 825, 830.

**23.**  *See, e.g.,* District Court Rule 5, *supra* notes 19 and 20.

### Pretrial Order

■ ¶ 13 Pretrial order is a procedural tool that serves to ensure (a) the economical and efficient conduct of trial in every case and (b) the expeditious resolution of the merits [24] without ambush or surprise.[25] A well-crafted pretrial order makes specific the legal theories on which each party is proceeding and crystallizes the issues to be tried. The breach of rules for presenting testimonial and documentary evidence without some tenable legal ground brings about expected consequences that are not offensive to due process.[26] A party's failure timely to submit a witness's name or an item of documentary evidence before the PRT deadline may result in the exclusion of omitted proof.[27] The burden rests upon the adversely affected party to show a tenable legal ground for the party's inability earlier to identify the documentary and testimonial evidence intended to be offered in the hearings

### The Offer Of Proof

■ %¶ 14 When an objection to testimonial or documentary proof is sustained on the ground that it was not submitted before the PRT deadline, the party seeking to avoid the probative exclusion must *tender* sufficient excuse for its failure earlier to identify the tendered evidence. If the excuse is rejected, the proof sought to be adduced must be followed by an offer of proof.[28] Two purposes are served by an offer of proof. It

enables the panel to probe into one's tardy offer and preserves the record for this court's *de novo* scrutiny.

### Documentary Evidence Offered ' For Rebuttal

■ ¶ 15 When considering whether testimonial or documentary evidence offered for rebuttal should be admitted, though it was tendered *after* the panel's deadline for timely submission in advance of the hearing, greater latitude is to be allowed than when resolving similar questions for one's case in chief.[29] Rebuttal evidence is that which becomes relevant because of proof introduced by the adverse party. Its purpose is to explain or counter the opponent's proof.[30] This is particularly correct where in order to impeach a witness the question addresses itself to the admissibility of a prior inconsistent statement. The appearance of an untimely tendered rebuttal witness—who is called to relate a trial witness's prior inconsistent statement and other rebuttal proof—must be freed from the restraints imposed by a pretrial order. On the other hand, testimony whose purpose is to contradict an *expected* and *anticipated* portion of the opponent's case in chief can never be termed "rebuttal" in the sense used in a' pretrial order that requires disclosure of all prospective witnesses except those for rebuttal.[31] When accounting issues tend to be complex, and the

---

24. The word "merits" has a well-defined meaning in law. What is on or dehors the merits depends on whether the issue at hand affects one or more elements of the claim for relief or those of the defenses that may be interposed against it. *Pryse Monument Company v. District Court of Kay County*, 1979 OK 71, ¶ 3, 595 P.2d 435, 437–38 (when a case is terminated as time-barred, the disposition is "on the merits" because the statute of limitations is an affirmative defense).

25. *See, e.g., Grant v. Brandt*, 796 F.2d 351, 355 (10th Cir.1986); *Smith v. Ford Motor Co.*, 626 F.2d 784, 795 (10th Cir.1980); *Case v. Abrams*, 352 F.2d 193, 195 (10th Cir.1965).

26. Orderly process that the constitution commands is offended when unexcused failure is shown for a timely provision of the information. Evenhanded fairness calls for undeviating enforcement of conformity to orderly process. *Rodgers v. Higgins*, 1993 OK 45, ¶ 34, 871 P.2d 398, 414; *Snyder v. Smith Welding & Fabrica-*

27. *James v. Newspaper Agency Corp.*, 591 F.2d 579, 582 (10th Cir.1979).

28. *Crussel v. Kirk*, 1995 OK 41, ¶ 8, 894 P.2d 1116, 1119.

29. *Crussel, supra* note 28, at ¶ 24, at 1119; *Middlebrook v. Imler, Tenny & Kugler, M.D.'s*, 1985 OK 66, 713 P.2d 572, 582.

30. *Middlebrook, supra* note 29, at ¶ 24, at 582; *Faulkenberry v. Kansas City Southern Ry. Co.*, 1983 OK 26, ¶ 19, 661 P.2d 510, 514.

31. *See In re Apex Oil Co.*, 958 F.2d 243, 245 (8th Cir.1992), *cert. denied*, 506 U.S. 861, 113 S.Ct. 180, 121 L.Ed.2d 125 (1992); *Morgan v. Commercial Union Assur. Cos.*, 606 F.2d 554, 555 (5th Cir.1979).

*tion*, 1986 OK 35, 746 P.2d 168, 171; *Pryse, supra* note 24, at ¶ 5, at 438.

totality of the prosecution's proof cannot easily be anticipated, the court must allow more latitude than that which would be due if the case rested on simple uncomplicated elements of disciplinary breach.

### Review of Evidentiary Rulings

¶ 16 For consideration of PRT's critical evidentiary rulings, this court conducts a nondeferential, *de novo* examination of all relevant factors,[32] in the context of which the dispositions of the trial panel are neither binding nor persuasive.[33] PRT's findings of fact and conclusions of law are merely a method of presenting the case before a court of competent jurisdiction. The panel is a conduit for submission of the case. The task of reviewing PRT's evidentiary rulings is to be distinguished from two other remedial notions with which it may easily be confused: (a) *de novo appellate review* on the record and (b) a trial *de novo*. The latter denotes a *retrial* of an entire case before a *different tribunal*, with all litigable issues standing as though they had never been resolved before.[34] The former—*de novo appellate review* on the record—requires an independent, non-deferential re-examination of *another tribunal's* record and findings.[35] *Our de novo review in bar disciplinary cases is that of a first-instance judicial tribunal using for its medium a transcribed record rather than oral proceedings by viva voce testimony.*[36]

¶ 17 PRT's 27 March 1997 scheduling order directed the parties to provide each other with a final list by 8 April 1997, which was to include a brief description of each proposed exhibit item and a list of witnesses. *The order, which was entered more than six months before the trial commenced*, specifically states that *"[e]xcept for good cause shown, no witnesses shall be permitted to testify in chief for any party unless such witness' name was listed."* During the course of the disciplinary proceedings, respondent offered for admission numerous exhibits, as well as the testimony of two witnesses, which he had failed to submit before the PRT deadline for identification of documentary and testimonial evidence intended to be offered in the hearings. PRT *refused to admit* those items of documentary and testimonial proof which were not submitted before its imposed deadline and met mid-hearing objection from the Bar.

¶ 18 *It would have been better practice and more helpful to this court's de novo review for the PRT to have ruled on each item that was offered and excluded from evidence by providing a reasoned basis for the panel's action.* These very rulings we must now make ourselves. The excluded evidence (tendered by respondent) falls into three categories—(1) correctly excluded documentary evidence followed by a proffer,[37]

32. *Leigh, supra* note 9, at ¶ 11, at 666; *Eakin, supra* note 9, at ¶ 8, at 647–648; *Lloyd, supra* note 11 at ¶ 8, at 858; *Stubblefield, supra* note 11, at ¶ 7, at 982; *Cantrell, supra* note 11, at ¶ 1, at 1293; *State ex rel. Okl. Bar Ass'n v. Brandon*, 1969 OK 28, ¶ 5, 450 P.2d 824, 827.

33. *Eakin, supra* note 9, at ¶ 8, at 648; *Raskin, supra* note 9, at ¶ 11, at 265. The court's range of options in a disciplinary proceeding is set forth in RGDP Rule 6.15(a), *supra* note 12.

34. *See Shelton v. Lambert*, 1965 OK 28, ¶ 11, 399 P.2d 467, 470; *Globe–Union, Inc. v. Chicago Telephone Supply Co.*, 103 F.2d 722, 728 (7th Cir.1939).

35. *See Brown v. Burkett*, 1988 OK 49, 755 P.2d 650, 651; *Globe–Union, supra* note 34, at 728; Niehaus v. Madden, 348 Mo. 770, 155 S.W.2d 141, 145 (1941); *see also* Art. 9 § 20, Okl. Const.; *Atchison, Topeka & Santa Fe Ry. Co. v. State*, 1984 OK 87, 692 P.2d 554, 555–556. The pertinent provisions of Art. 9 § 20, Okl. Const., are:

"The Supreme Court's review of appealable orders of the Corporation Commission shall be judicial only, and in all appeals involving in [sic] asserted violation of any right of the parties under the Constitution of the United States or the Constitution of the State of Oklahoma, the Court shall exercise its own independent judgment as to both the law and the facts. * * * " (Emphasis supplied.)

36. *Viva voce* testimony means "[w]ith the living voice; by word of mouth." BLACK'S LAW DICTIONARY 1410 (5th ed.1979). As applied to a trial, this phrase is equivalent to oral proceedings. It is used in contradistinction to evidence in the form of a written record. *Id. See also* Nicholas A. Kronfeld, *The Preservation And Discovery of Evidence Under Federal Rule of Civil Procedure 27*, 78 Geo. L.J. 593, 623 (1990).

37. For correctly excluded items of documentary evidence, see detailed explanation in Appendix A.

(2) correctly excluded documentary evidence followed by an insufficient proffer[38] and (3) correctly excluded testimonial evidence followed by a proffer.[39]

¶ 19 On *de novo* review of PRT's evidentiary rulings, we *hold that* (1) *the documentary and testimonial proof* shown in Appendices A and C either (a) has *direct relevance* to respondent's *defense* of the disciplinary complaint or (b) constitutes rebuttal testimony addressed to an *expected* or *anticipated* portion of the Bar's case; and (2) the proffer of documentary proof shown in Appendix B is insufficient for testing the correctness of the panel's exclusion. We adopt these PRT evidentiary rulings as correct.

## IV

## COUNT ONE

¶ 20 *Count one* of the complaint rests on a grievance filed by Ann Harker [Harker], respondent's client. Harker was sued by her former employer to collect a debt on two promissory notes and for damages occasioned by her misappropriation of funds.[40] She engaged respondent as her counsel. He unsuccessfully sought to settle that dispute before a civil action was commenced. On 8

October 1993 respondent filed an answer on behalf of Harker.

### The Summary Judgment On Harker's Default

¶ 21 On 11 January 1994 the plaintiff filed a first request for admissions. Respondent sent the requests (and a cover letter) to Harker, explaining the need for a return of the materials by 1 February 1994. Harker received the admissions and enclosure, but could not fully understand the substance of the request. She answered some of the few admissions, and then sent a letter to respondent, dated 26 January 1994, setting out the source of her confusion.[41] Respondent failed to respond to his client's letter .[42] Hearing nothing from respondent, Harker wrote a second letter on 4 February 1994, explaining in detail the difficulty she encountered in answering the request for admissions. She enclosed a copy of her January 26 letter as well as a check for $50.00.[43] Harker testified that respondent failed to answer the second letter as well.[44] She believed that respondent did not file an answer to the request for admissions because she had not given him all the information.[45] While respondent was ir-

---

38. For correctly excluded items of documentary evidence, see detailed explanation in Appendix B.

39. For correctly excluded items of testimonial evidence, see detailed explanation in Appendix C.

40. Henthorne v. Harker, CJ–93–3402, District Court, Tulsa County.

41. Complainant's Exhibit 4, a letter from Harker to respondent dated 26 January 1994, states:

"I don't know how to answer Admission 5–11 because I don't know which note is Exhibit A and which is Exhibit B. If you could let me know then I would be able to answer them intelligently . . . ."

42. Transcript, PRT hearing, 8 October 1997, at 220–21:

"Q: Did he call you in response to your letter marked Exhibit 4?
A: [Harker] No, he did not. I faxed him and I called him and I just assumed that probably this was the way it was going to be answered and this, you know, everything was taken care of because I didn't hear anything back from him."

43. Complainant's Exhibit 5, a letter from Harker to respondent dated 4 February 1994, states in part:

"* * *I am enclosing a copy of the letter I faxed to your office on January 26th. I called again on February 4th and left a message on your answering machine. I really don't know exactly how to answer the questions you sent but I"ll take a stab at it. * * * You can see my problem Mike, I don't have enough information to answer questions 5–11. I did not keep copies of anything I turned everything over to you.* * *"

44. Transcript, PRT hearing, 8 October 1997, at 221:

"Q: And what was Mr. Busch's response to your letter dated February 4th?
A: I didn't hear from him.
Q: Did he ever tell you by correspondence or over the phone or in person that your information was incomplete or inadequate?
A: No."

45. Transcript, PRT hearing, 17 February 1998, at 1057:

"Q: Why did you not file a response?

ritated with Harker's inability to provide the requested information, he neither sought an extension of time in which to file a response nor permission to withdraw as her counsel of record. On 28 February 1994 the plaintiff moved for summary judgment.

¶ 22 Respondent testified that no response to the motion was made because Harker had not instructed him either to defend the suit or to file for bankruptcy.[46] It was her own decision, respondent stated, not to file a response to the motion for summary judgment and to allow a default judgment to be entered against her.[47] According to respondent, because Harker's decision not to oppose summary judgment had been made at an earlier stage of the litigation, he did not again discuss this matter with her immediately after the motion was filed.[48]

¶ 23 A default judgment entered against Harker on 29 April 1994 was in the amount of $108,639.41, of which $41,962.00 was based on the finding that Harker had *"wrongfully embezzled and misappropriated"* that sum. The quoted language of the amended journal entry made the debt nondischargeable in bankruptcy. Although accepting the blame for the presence of this language in the judgment, respondent failed to seek its vacation or reconsideration or to bring an appeal.

¶ 24 According to respondent, shortly after he received the 29 April 1994 amended journal entry and discovered the critical "embezzlement" terminology, he discussed various options with Harker and her son: (a) an adversarial contest in bankruptcy, (b) a direct appeal or (c) a motion to set aside the judgment. According to Harker, she tried to contact respondent that day by fax and by phone but could not reach him.[49] Respondent denies that he failed to return her call.

A: [Busch] I didn't have answers."

46. Transcript, PRT hearing, 17 February 1998, at 1100:

"Q: What's the story? What's your explanation for how that happened if you had received instructions up until that time of defend this lady, you know, and she was not agreeing to file bankruptcy up until after March 28th?
A: The ethical obligation to defend her was there. I did not receive instructions to either defend or file the bankruptcy. It's—she had to make a decision on what she was going to do. She just kept dragging it out."

47. Transcript, PRT hearing, 17 February 1998, at 1063–64.

48. Respondent appears to give inconsistent responses to the question of when the decision not to file a response to the summary had been made.

Transcript, PRT hearing, 17 February 1998, at 1060–61:
"Q. * * * Do you recall what you talked about with Ms. Harker in your conversation with her *after your receipt* of the motion for summary judgment? Did you talk about the motion for summary judgment?
A. Talked about the motion for summary judgment, talked about bankruptcy.
Q. Did you—
A. Those are—and much more beyond that. The specific details of it, I don't recall.
Q: Did you tell her you *were not going to file a* response to the motion for summary judgment?

A: No. The *decision had not been made* at that point in time." (Emphasis supplied.)
Transcript, PRT hearing, 17 February 1998, at 1062:
"Q. Did you ever tell Mrs. Harker that you were not going to—that you *had not responded* to the motion for summary judgment?
A. Technically, I would say that that is correct.
Q. The answer to my question is no.
A. That I—I did not tell her because it was a decision that we had made. When I say we, it would be Mrs. Harker and myself and so I didn't come back and say oh, by the way, a few days later, you know I didn't file that answer.
Q. And when did you and she, as you claim, come to that conclusion?
A. It would have been in this time period first set about by the admissions. * * * " (Emphasis supplied.)

49. Complainant's Exhibit 6 (a fax cover sheet from Harker to Busch dated 10 May 1994 with a copy of the garnishment affidavit attached) states:

"Mike, Did I agree to a judgment of $106,-572.91? Where did this come from? What's going on? I don't owe her $106,572.91!"
On 10 May 1994 Harker also tried to reach respondent by phone. The notation on the 10 May 1994 message slip indicates Harker's concerns when she called: "She's pissed! Really needs to talk with you today. Re. Garnishment." (Complainant's Exhibit 56, dated 10 May). A few days later Harker again tried to reach respondent by phone. The message slip states: "What happened last week". (Complainant's Exhibit 57, dated 16 May).

### The Indemnity Agreement

¶ 25 Because the judgment included a finding of misappropriation and embezzlement, respondent offered to file for Harker a Chapter 13 bankruptcy [50] and to indemnify her for any portion of the judgment deemed nondischargeable.[51] Respondent did not advise Harker to consult with another attorney about the indemnification agreement.[52] His reason for not doing so is that Harker's son, a lawyer, was present when he discussed the matter with her.

### The Two Bankruptcies

¶ 26 On 31 May 1994 respondent filed a Chapter 13 bankruptcy on Harker's behalf. Because the schedules and a Chapter 13 plan were not timely tendered, the bankruptcy was dismissed on 24 August 1994. Respondent filed a second Chapter 13 bankruptcy on 15 November 1994 and himself paid the filing fees. The initial meeting of the creditors was stricken because respondent told the bankruptcy trustee that he was converting the case from a Chapter 13 to a Chapter 7 proceeding.[53] Inasmuch as respondent failed both to file the schedules by 30 November 1994 and to convert the proceeding to a Chapter 7 cause, Harker's second bankruptcy was dismissed on 20 January 1995. Harker had never agreed to a voluntary dismissal of either cause.

¶ 27 Although Harker's bankruptcy was eventually concluded by another attorney, she has not been indemnified for the nondischargeable portion of the default judgment. Respondent explains that the first dismissal was occasioned by Harker's failure to give him the necessary information to complete the forms and the second was due to the Harker's tax problems that had not been timely resolved. Even though Harker's son was not listed as counsel of record on either of his mother's bankruptcies, respondent assumed that she "was receiving independent counsel" from her son about the happenings in the those cases.

¶ 28 The panel concluded that respondent violated (a) *ORPC Rule 1.1* [54] by failing to

---

**50.** Transcript, PRT hearing, 17 February 1998, at 1069:

"Q: Did you agree to file a bankruptcy for Ms. Harker?
A: Yes"

*See also* Transcript, PRT hearing, 17 February 1998, at 1121:

"Q: So I want to know, having given you those—time on a time line, when did you discuss filing bankruptcy and actually then following through on it?
A: Discussed filing bankruptcy after I received the judgment."

**51.** Complainant's Exhibit 50 (a letter from respondent's counsel to the Bar dated 21 May 1996) states that respondent had offered to indemnify Harker "for any amounts she incurred as a result of any wrong doing on his part." *See* also Transcript, PRT hearing, 17 February 1998, at 1073–74:

"Q. Did you agree to indemnify Ms. Harker for any amount she incurred as a result of any wrongdoing on your part?
A. No, that was not the—the agreement.
Q. Referring to Complainant's Exhibit 50 ... it is stated, quote, Mr. Busch agreed to indemnify Ms. Harker for any amount she incurred as a result of any wrongdoing on his part, close quotes.
Is that—did I read that accurately, referring to the third paragraph of Complainant's Exhibit 50?
A. You read that accurately, but it's also taken out of context.

Q. Okay. Can you put it into context for us?
A. It's any wrongdoings that I may have done with regard to the motion for summary judgment."

**52.** Transcript, PRT hearing, 17 February 1998, at 1075:

"Q: Before you agreed to indemnify Ms. Harker for any—for an amount based upon your possible wrongdoing in regards to the amount of the judgment, did you advise Ms. Harker that independent representation was probably appropriate before entering such an agreement with her?
A: No, I did not because I made the representation while her son was there."

**53.** The trustee's 17 January 1995 motion for immediate dismissal of the case (Complainant's Exhibit 20) states:

"* * *The initial meeting of creditors called by the United States Trustee was set for December 14, 1994. At that time, counsel for the debtor orally represented to the Trustee that this case was being converted to a case under Chapter 7. Based upon that representation, the Trustee struck the meeting of creditors and filed his Trustee Meeting Report on December 15, 1994. * * *"

**54.** The terms of ORPC Rule 1.1 (Competence) are:

"A lawyer shall provide competent representation to a client. Competent representation re-

represent his client in a competent manner, (b) *ORPC Rule 1.2(a)* [55] by failing to consult with his client regarding representation, (c) *ORPC Rule 1.3* [56] by failing to act with reasonable diligence and promptness in his representation, (d) *ORPC Rule 3.2* [57] by failing to make reasonable efforts to expedite litigation in a manner consistent with his client's interests and (e) *ORPC Rule 1.4(a)* and *(b)* [58] by failing to keep his client reasonably informed about the status of her case because

quires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."
The Comment to ORPC Rule 1.1 states in part: "Legal Knowledge and Skill. In determining whether a lawyer employs the requisite knowledge and skill in a particular matter, relevant factors include the relative complexity and specialized nature of the matter, the lawyer's general experience in the field in question, the preparation and study the lawyer is able to give the matter, and whether it is feasible to refer the matter to, or associate or consult with, a lawyer of established competence in the field in question. In many instances, the required proficiency is that of a general practitioner. Expertise in a particular field of law may be required in some circumstances.* * * "

55. The pertinent terms of ORPC Rule 1.2(a) (Scope of Representation) are:

"(a) A lawyer shall abide by a client's decisions concerning the objectives of representation, subject to paragraphs (b), (c), and (d) and *shall consult with the client as to the means by which they are to be pursued.* A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter. * * * " (Emphasis supplied.)
The Comment to ORPC Rule 1.2 states in part: "Both lawyer and client have authority and responsibility in the objectives and means of representation. The client has ultimate authority to determine the purposes to be served by legal representation, within the limits imposed by law and the lawyer's professional obligations. Within those limits, a client also has a right to consult with the lawyer about the means to be used in pursuing those objectives...."

56. The terms of ORPC Rule 1.3 (Diligence) are:

"A lawyer shall act with reasonable diligence and promptness in representing a client."
The Comment to ORPC Rule 1.3 states in part: "A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and may take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer should act with commitment

he (1) did not adequately explain legal matters to her which would permit her to make informed decisions about the representation and (2) failed promptly to comply with reasonable requests for information. The PRT also concluded that respondent violated (a) *ORPC Rule 1.8(h)* [59] by failing to advise Harker in writing that independent representation was appropriate in connection with the indemnification agreement by which respondent agreed to pay for any portion of the

and dedication to the interests of the client and with zeal in advocacy upon the client's behalf. * * *.
Perhaps no professional shortcoming is more widely resented than procrastination. A client's interests often can be adversely affected by the passage of time or the change of conditions; in extreme instances, as when a lawyer overlooks a statute of limitations, the client's legal position may be destroyed. Even when the client's interests are not affected in substance, however, unreasonable delay can cause a client needless anxiety and undermine confidence in the lawyer's trustworthiness.
* * * If a lawyer has served a client over a substantial period in a variety of matters, the client sometimes may assume that the lawyer will continue to serve on a continuing basis unless the lawyer gives notice of withdrawal. Doubt about whether a client-lawyer relationship still exists should be clarified by the lawyer, preferably in writing, so that the client will not mistakenly suppose the lawyer is looking after the client's affairs when the lawyer has ceased to do so. * * * "

57. The terms of ORPC Rule 3.2 (Expediting Litigation) are:

"A lawyer shall make reasonable efforts to expedite litigation consistent with the interest of the client."

58. The terms of ORPC Rule 1.4 (Communication) are:

"(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information. (b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation."

59. The terms of ORPC Rule 1.8(h) (Conflict of Interest; Prohibited Transactions) are:

"(h) A lawyer shall not make an agreement prospectively limiting the lawyer's liability to a client for the lawyer's personal malpractice, or settle a claim for such liability with an unrepresented client or former client without first advising that person in writing that indepen-

judgment that may be held nondischargeable in bankruptcy [60] and (b) *ORPC Rule 8.4(c)* [61] by failing to keep his client fully informed about the status of the case.[62]

¶ 29 We find that each of these violations has been established by clear and convincing evidence. Inasmuch as respondent said he believed it was unnecessary to do so because the client's son, an attorney, was present, his utterance reveals a basic misunderstanding of why the rule calls for independent advice. It is to give a client notice that his (or her) attorney has some type of personal interest at stake. The mere presence of a client's lawyer-relative when an indemnification agreement is discussed does not relieve a practitioner of the obligation to explain the legal implications to the client. We hold that respondent should have advised Harker to seek other representation on the indemnification phase. In failing to do so, he violated ORPC Rule 1.8(h).[63] Following adequate notice, it is the client who must then decide whether to seek independent legal representation.

¶ 30 The evidence is a clear and convincing that respondent failed to inform his client (a) that a judgment had been rendered against her and (b) that it contained language which would make the debt nondischargeable in bankruptcy.

¶ 31 A lawyer's license is this court's certificate of the bearer's ongoing professional fitness to deal with the public as a legal practitioner. Public confidence in the practitioner is essential to the orderly functioning of the profession. A lawyer's misconduct adversely reflects on the entire Bar because it exhibits a lack of commitment to the client's cause, to the courts, and to other members of the Bar.[64]

¶ 32 Professional competence—acting promptly in pending matters and communicating with a client—is a licensed legal practitioner's mandatory obligation. Albeit onerous, it is the very minimum to be expected from a lawyer. It epitomizes professionalism.[65] Respondent's failure to maintain these standards of professional conduct—through procrastination and neglectful behavior—warrants imposition of disciplinary sanction.

## V

## COUNT TWO

¶ 33 Count two arises from a complaint by Kish Resources [Kish]. Kish is an Irish corporation doing oil and gas business in the United States.[66] In the spring of 1992 Kish retained respondent to assist in the acquisition and production of the "Iron Post" lease, located in Creek County, Oklahoma.[67] Kish's managing director (or chief executive) at the time was Patrick Butler [Butler].[68] The rele-

dent representation is appropriate in connection therewith."

60. *See supra* note 49.

61. The terms of ORPC Rule 8.4(c) (Misconduct) are:
   "It is professional misconduct for a lawyer to:
   \*   \*   \*   \*   \*   \*
   (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation."

62. *See State ex rel. Okl. v. Busch*, 1993 OK 72, ¶ 13, 853 P.2d 194, 196 [*Busch II*] (respondent violated ORPC Rule 8.4(c) by failing to keep his client fully informed about the status of a wrongful termination case).

63. For the terms of ORPC Rule 1.8(h), see *supra* note 59. *See also Busch II, supra* note 62, at 196 (where respondent violated ORPC Rule 1.8(h) for failing to inform his client to get independent legal representation before settling a possible claim against respondent).

64. *State ex rel. Okl. Bar Ass'n v. Evans*, 1994 OK 45, ¶ 17, 880 P.2d 333, 336; *Bolton, supra* note 9, at ¶ 19, at 346.

65. *Evans, supra* note 64, at ¶ 16, at 336.

66. Kish was developing oil and gas leases in Oklahoma, Texas, and Kentucky, as well as a gold mine in Nevada.

67. In Complainant's Exhibit 40, page 2, respondent confirms that he will take action to secure the Iron Post lease: "It is agreed that I will represent Kish on the above three actions for 25% of the recovery that I obtain for Kish. In those portions where no recovery is possible, an hourly basis to be paid in Kish shares at a rate of $100.00 per hour."

68. Transcript, PRT hearing, 8 October 1997, at 25:
   "Q: And what was your role with Kish?
   A: My role was that I was a managing director. In other words, chief executive...."

vant facts are both complex and complicated. They relate to movement of various assets, stock transfers, and sales of stock. These transactions took place throughout the course of respondent's representation. The critical facts center upon respondent's misuse of his trust account by failing to account for and maintain a record of trust dealings.

¶ 34  In August of 1992 respondent was entrusted with $65,000 from Kish investors. Forty thousand dollars went to Houseco for the initial purchase of the Iron Post lease. There remained an outstanding balance of $25,000.[69]  Respondent held the latter amount and used it for expenses incurred in the startup process and operation of Iron Post.

¶ 35  Later in November of 1992 respondent arranged for the sale of ARC stock owned by Kish. The proceeds from this sale also were entrusted to respondent. He was to receive power of attorney for the sale of the stock, arrange a sale, and then hold the funds in trust until Kish authorized further action to be taken.[70]  Upon receipt of the stock proceeds ($76,657.70) respondent confirmed by letter his understanding of the arrangement—that $50,000 was to be sent to Kish, and that $26,657.70 would be entrusted to respondent.[71]  The retained portion of the proceeds was to be used exclusively for payment of the judgment[72] or for payment of future expenses incurred through operation of the Iron Post lease.  Respondent's understanding of the arrangement was clear— "there should be no disbursing of funds without first authorization from . . . [Kish]."[73] Following receipt of the ARC stock proceeds, respondent allegedly made numerous wrongful withdrawals from the trust account.[74]

¶ 36  The specific violations at issue deal with the assets entrusted to respondent solely from the November sale of ARC stock, amounting to $76,657.70.  In December of 1992 there was a third and final sale of Kish-owned ARC stock.  The proceeds were origi-

---

**69.** Transcript, PRT hearing, 23 December 1997, at 937–38:

"Q:  Now, Mr. Busch, did you eventually receive $65,000 from Mr. Butler?
A:  Yes, I did.
Q:  And what was the purpose of the $65,000?
A:  At that point in time—let's see if I can— some of the money was to be used to operate the Iron Post Field, and $40,000 was going to be paid to Housco [sic] as partial payment on final payment of their Housco/Kish [sic] note."

**70.** Complainant's Exhibit 28, a letter from respondent to Kish dated 22 October 1992, states:

"Dear Pat:  This is to confirm our telephone conversation of today in which you instructed me to safeguard Kish's shares of stock and arrange for their sale. . . . At that time, you will give me further instructions on what steps need to be taken.  Further, I will advise you of any actions Kish should take, or actions I should take, to protect Kish interest.  In any event, there should be no disbursing of funds without first authorization from yourself."
Kish gave Respondent the power of attorney to sell the ARC stock certificates with instructions to hold the funds until Kish orders further action. Complainant's Exhibit 29 (a fax from Kish to Respondent).

**71.** Complainant's Exhibit 32 (13 January 1993 letter from respondent to Kish), states:

"Dear Pat, I received $76,651.70 from Don Boyer (Stockholder) as part of the above share sale.  To comply with my letter to you of October 22, 1992, I now enclose my check for $50,000.00.  It is agreed I retain the balance of $26,657.70 in case we have to pay Houseco the $25,000.000 if we don't win our pending case against House or if we need to do work on the Iron Post property."

**72.** Complainant's Exhibit 40; Kish was withholding the remaining $25,000 balance due to Houseco for the purchase of the Iron Post lease. Kish believed that 190 acres of the 2000 acre lease was lost due to Houseco's failure to properly file reports with the Bureau of Indian Affairs. The final payments were dependent upon the outcome of the litigation between Kish and Houseco.

**73.** *See* Complainant's Exhibit 28, *supra* note 70.

**74.** The Bar alleges that according to respondent's trust records, the following unlawful withdrawals were made (Complainant's Brief–in–Chief, pp. 7–8):

(a) on 13 November 1992, respondent made a $2,500 cash withdrawal;
(b) on 17 November 1992 respondent withdrew $3,000 for a purpose not indicated;
(c) on 18 November 1992 respondent made a $260 cash withdrawal;
(d) on 19 November 1992 respondent paid $1,500 to himself;
(e) on 25 November 1992 respondent made a $750 cash withdrawal;
(f) on 1 December 1992 respondent paid himself $8,000 towards attorney fees;

nally to be entrusted to respondent, but Butler placed a stop payment on the transfer to him. That stop payment order is not essential to the issue here. Respondent had already received and deposited the November proceeds prior to the issuance of the stop payment order. The critical issue for this case is how the November proceeds were entrusted and accounted for according to the 22 October 1992 agreement.[75]

¶ 37 On 17 December 1992 respondent complied with Kish's order to transfer the entrusted $50,000 to a Nevada bank account. The transfer failed for lack of sufficient funds. On 13 January 1993 respondent confirmed that he was sending another $50,000 check to Kish but retaining the balance of the funds. Respondent's second check did not clear, again because of insufficient funds. On 18 February 1993 respondent confirmed an agreement with Kish to pay $50,000 over the course of three months, plus interest, in exchange for Kish's promise not to initiate legal action against him. Again, respondent failed to pay Kish.

¶ 38 After more than a year, the $50,000 remained unsatisfied. On 18 May 1994 Kish sought a lawyer in Kentucky, Charles Boarman [Boarman], to look into the matter. Boarman wrote a letter requesting respondent to clear up the obligation. Respondent failed to answer the letter. Boarman then wrote a second, more direct, communication. In spite of the repeated requests, respondent did not pay the amount sought. When the matter was not resolved, Kish filed a complaint against respondent.

¶ 39 Respondent attributes much to an incomplete record. He asserts that neither Kish nor Butler appears to be "paragons of financial integrity." Directing us to testimo-

ny at the PRT hearing, he states that Kish never possessed stable leadership and was notorious for not paying its bills, which necessitated payment of many of its creditors with cash. Respondent explains that he was told by Kish's chief executive to repay himself and to use the balance of the $76,000 for operating funds. According to respondent, the $50,000 in question was not payable from the $76,000 stock sale, which was actually received and deposited into his trust fund. Rather, he claims that it was from a separate pool of funds represented by a check received by him, payment of which was stopped by Kish through its stockbroker. Directing us to the testimony of his lease operator, Beverly Vassar, respondent argues that she had made an accounting of the funds to Kish on many occasions, both orally and in writing. His inability to document this version of the expenditures is attributable to the fact that all of his accounting records have been forwarded to Kish. Moreover, he admits that his recordkeeping and records maintenance was "abysmal".

¶ 40 The PRT found and concluded that respondent violated (a) *ORPC Rule 1.3*[76] by failing to represent his client with reasonable diligence and promptness, (b) *ORPC Rule 1.4(a)*[77] by failing to keep his client reasonably informed about the status of their affairs and by failing promptly to comply with reasonable requests for information, (c) *ORPC Rule 1.15(b)*[78] by failing to transfer the proceeds from the sale of the stock as instructed and agreed and by failing to render promptly a full accounting regarding such property, (d) *ORPC Rule 8.4(c)*[79] by engaging in conduct involving dishonesty, fraud, deceit and misrepresentation, and (e)

(g) on 4 December 1992 respondent paid himself $6,101.56 towards attorney fees.

75. *See* Complainant's Exhibit 32 (13 January 1993 letter from respondent to Kish), *supra*. note 71.

76. For the terms of ORPC Rule 1.3, see *supra* note 56.

77. For the terms of OPRC 1.4(a), see *supra* note 58.

78. The terms of ORPC Rule 1.15(b) (Safekeeping) are:

"(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property."

79. For the terms of ORPC Rule 8.4(c), see *supra* note 61.

*RGDP Rule 1.4(b)* [80] by failing to apply funds toward a specific purpose for which it was entrusted and by failing to account for and deliver such funds upon demand.

¶ 41 Respondent's failure to provide diligent representation and keep his client reasonably informed as to the status of representation amounts to a violation of ORPC Rule 1.3 [81] and ORPC Rule 1.4(a).[82] Kish made repeated attempts to contact respondent, but could never reach him, nor were its calls returned. Kish had to initiate contact directly with the stock broker to understand the status of the stock transfer.[83] Respondent's failure promptly to reply to his client's request violates ORPC Rules 1.3 and 1.4(a).

¶ 42 A lawyer's highest fiduciary duty comes into being when a legal practitioner is entrusted with a client's funds. A fiduciary of the highest order, the trustee must meet the settlor's expectation that the obligations imposed on the office of trustee will be carried out for the exclusive benefit of the *cestui que trust*.[84] To the *cestui que trust* a trustee always owes *uberrima fides*.[85] Upon receipt of a client's money, a lawyer must immediately notify the affected principal. Respondent received and deposited $76,657.70 of Kish's stock proceeds in November of 1992. Not only did he fail to notify Kish upon receipt of the funds, but he has also failed to remit the proceeds. Respondent has clearly violated ORPC Rule 1.15(b).[86]

¶ 43 When a client's money is entrusted to an attorney, the latter's fiduciary duty is to apply strictly the funds to the specific purpose intended. Where money has been entrusted to any attorney for a specific purpose, he must apply it to that purpose. He may not avail himself of a counterclaim or set-off for fees by interposing demands against any money of his client coming into his hands for such specific purpose.[87] We employ three different culpabili-

---

80. The pertinent terms of RGDP Rule 1.4(b) are: (b) Where money or other property has been entrusted to any attorney for a specific purpose, he must apply it to that purpose. He may not avail himself of a counterclaim or set-off for fees against any money or other property of his client coming into his hands for such specific purpose, and a refusal to account for and deliver over such money or property upon demand shall be deemed a conversion. This does not apply to the retention of money or other property otherwise coming into the hands of a lawyer and upon which the lawyer has a valid lien for his services.

81. For the terms of ORPC Rule 1.3, see *supra* note 56.

82. For the pertinent terms of ORPC Rule 1.4(b), see *supra* note 58.

83. *See* Complainant's Exhibit 30, a fax cover sheet from Peterson Icenogle (stock broker) to Respondent, showing that Kish could not get in touch with Respondent:
"Mike, Just received Pat's fax after he called at 10:45 a.m. to discuss the same thing. He said he cannot contact you. Wants $'s sent directly to him. Your thoughts!! ASAP. Thanks, Don B. 11–23–92."

84. *See State ex rel. Okl. Bar Ass'n v. Wallace,* 1998 OK 65, ¶ 22, 961 P.2d 818, 826 n. 22 (citing *First National Bank of Wichita Falls v. Stricklin,* 1959 OK 208, 347 P.2d 652).

85. *Wallace, supra* note 84, at ¶ 22, at 826 (citing BLACKS LAW DICTIONARY 1690 (Revised 4th ed.1968) which translates the Latin phrase *uberrima fides* as "the most abundant good faith, absolute and perfect candor or openness and honesty").

86. *See State ex rel. Okl. Bar Ass'n v. Wilkins,* 1995 OK 59, ¶ 17, 898 P.2d 147, 149 (respondent violated ORPC Rule 1.15(b) for failing to notify and remit payments made for his client's benefit).

87. *Wallace, supra* note 84, at ¶ 22, at 826; *Wilkins, supra* note 86, at ¶ 26, at 152, 198 So. 335; *State ex rel. Oklahoma Bar Ass'n v. Cummings,* 1993 OK 127, ¶ 26, 863 P.2d 1164, 1171 (when entrusted with money for a specific purpose a lawyer must not allow his claimed fee for services rendered to conflict with his duties as a fiduciary). In *State ex rel. Okl. Bar Ass'n v. Miskovsky,* 1990 OK 12, ¶ 6, 804 P.2d 434, 436–437, a lawyer held money for the specific purpose of preserving an oil and gas lease. When the lease ceased to exist, the lawyer claimed the money for his attorney's fee. We dismissed the charge of a Rule 1.4(c) violation because, unlike in the present case, it was unclear from the record whether the client had agreed to have those funds apply towards payment of an attorney's fee. *See also Wilkerson v. Olcott,* 212 So.2d 119, 121 (4 D.C.A.Fla.1968) (a fiduciary, be he an attorney or not, must account for and deliver over property or money of a beneficiary or client which has been entrusted for a specific purpose); *Wilkins v. Wilkins,* 144 Fla. 590, 198 So. 335, 336–337 (1940) (equity imposes a constructive trust where a trustee or other fiduciary has

ty standards when evaluating mishandling of client funds: [88] 1) *commingling*, which takes place when client money is intermixed with the attorney's personal funds; 2) *simple conversion*, which occurs when a lawyer applies a client's money to a purpose other than that for which it was entrusted to the attorney and 3) *misappropriation*, the most serious infraction, which involves theft by conversion or otherwise when an attorney purposefully deprives a client of money by way of deceit and fraud.

¶ 44 Respondent clearly understood, through his own words, that $50,000 of the November stock proceeds were to go into the trust, while the remaining $26,657.70 was to be used for payment of adverse judgments or incurred expenses from the Iron Post lease. Following respondent's deposit of the November proceeds, he made a number of unauthorized withdrawals from the trust account. The trust record entries show that respondent made withdrawals, giving his succinct descriptions of the purpose: "cash," "attorney's fees," "Michael J. Busch," and "not indicated."

¶ 45 The fact that the client owes a fee to his attorney is no excuse for the latter to appropriate the client's funds to his own use. [89] Upon a thorough review of the record, we conclude that respondent violated RGDP Rule 1.4(b) by failing strictly to apply the entrusted money to the specifically authorized purpose.

¶ 46 On 17 December 1992 respondent attempted a $50,000 wire transfer to Kish, but the transfer did not clear because of insufficient funds. On 13 January 1993 respondent sent another $50,000 check to Kish that also failed to clear for the same reason. On 18 February 1993 respondent sent a letter stating that he would pay Kish $50,000 with interest over three months, in exchange for Kish's commitment not to bring an action or complaint against him.

¶ 47 The issuance of overdrawn checks manifests an abiding disregard of the fundamental rule of ethics—that of common honesty. Without honesty the profession forfeits its role in the administration of legal process. [90] By failing to comply with his agreements and attempting payments by false means, respondent violated ORPC Rule 8.4(c). [91]

¶ 48 We hold that not only has respondent violated the above noted rules of professional conduct, but that he also is in violation of ORPC Rule 1.2(a). [92] Although the PRT panel concluded there was no clear and convincing showing that respondent violated ORPC Rule 1.2(a), we disagree and hold to the contrary. ORPC Rule 1.2(a) imposes upon attorneys a duty to abide by a client's decisions concerning the objectives of representation. [93] As the record clearly establishes, respondent failed to remit to his client $50,000 in stock proceeds. The scope of his representation was very clear—to keep in trust but not to spend the proceeds. When comparing respondent's acts with the duties imposed on him, the discrepancy is striking. We hence find his conduct sanctionable as a violation ORPC Rule 1.2(a).

## VI

### RESPONDENT SHOULD BE DISBARRED

¶ 49 Respondent urges that disbarment is not an appropriate discipline. According to him, the two complaints prosecuted in this cause were known to the Bar at the time of his last disciplinary proceeding. Because the Bar is pressing them piecemeal, he

abused the confidence placed in him, and fails to account for entrusted funds).

88. These standards were set out in *State ex rel Okl. Bar Ass'n v. Johnston*, 1993 OK 91, ¶ 21, 863 P.2d 1136, 1144; *Cummings, supra* note 87, at ¶ 23, at 1172.

89. *Wilkins, supra* note 86 at ¶ 27, at 152, 198 So. 335 (citing *State ex rel. Okl. v. Brown*, 1989 OK 75, 773 P.2d 751).

90. *State ex rel. Okl. Bar Ass'n v. Patmon*, 1997 OK 62, ¶ 5, 939 P.2d 1155, 1157.

91. For the terms of ORPC Rule 8.4(c), see *supra* note 61.

92. For the terms of ORPC Rule 1.2(a), see *supra* note 55.

93. *See* ORPC Rule 1.2(a), *supra* note 55.

will be prevented from applying for reinstatement for a period in excess of seven years. Moreover, respondent urges that the court find, as it did in *State ex rel. Okl. Bar Ass'n v. Busch [Busch III],*[94] that his attention deficit disorder avails as a mitigating factor. Assuming the court deems his conduct to warrant disbarment, he urges that the expulsion be retroactive to take effect from May 7, 1996, the effective date of his present two-year-and-a-day suspension.

¶ 50 Respondent's argument in support of mitigation is unpersuasive. *Busch III* teaches that the Americans with Disabilities Act[95] does not raise a barrier to the court's use of discipline for the misconduct of bar members.[96] This court has a constitutional duty to oversee the bar with a view to ensuring that its members are fit to practice law. Mitigation can be sought by showing many factors, such as, one's exemplary prior standing with the bar, acknowledgment of wrongful conduct, and mental infirmity.[97] Respondent has received sanctions for numerous bar grievances and refuses to acknowledge any sense of guilt for unethical conduct. Because (a) there is no causal connection between respondent's condition and the ethical violations in contest and (b) respondent's conduct did not undergo a change following his treatment, the mitigation plea is unpersuasive.[98]

¶ 51 The primary purpose for imposing professional discipline is not to punish but to protect the public by re-examining the offender's continued fitness to practice law.[99] For one who is so clearly shown no longer to be fit for professional activity, any discipline short of disbarment would be at odds with this court's duty to guard the public from sub-standard practitioners.[100] This respondent may no longer be deemed fit for the practice of law. He has been given a private reprimand in 1990,[101] a public censure in 1992,[102] a 90-day suspension in 1993[103] and a two-year-and-a-day suspension in 1996.[104] *In short, he now stands as a serious repeat offender.*

¶ 52 Upon *de novo* review and findings—rested on *clear and convincing evidence—that respondent is unfit for the practice of law,* he is disbarred and ordered to pay the costs of this proceeding in the sum of $10,-110.11.

¶ 53 **RESPONDENT IS DISBARRED AND ORDERED TO PAY THE COSTS OF THIS PROCEEDING, WHICH SHALL BE DUE WHEN THIS OPINION BECOMES FINAL.**

¶ 54 KAUGER, C.J., SUMMERS, V.C.J., HODGES, LAVENDER, SIMMS, HARGRAVE and ALMA WILSON, JJ, concur.

¶ 55 WATT, J., concurs in result.

¶ 56 **APPENDIX A**

**CORRECTLY EXCLUDED DOCUMENTARY EVIDENCE FOLLOWED BY PROFFER**

¶ 57 **A. COUNT ONE**

¶ 58 1) **Exhibit 41** (7 December 94 fax cover letter and memo from Busch to Harker's son (Jack)) was offered to show (a) that Busch had a meeting with Harker and her

**94.** 1996 OK 38, ¶ 31, 919 P.2d 1114, 1117 [*Busch III*].

**95.** 42 U.S.C. §§ 12101 et seq.

**96.** *Busch III, supra* note 94, at ¶ 29, at 1120.

**97.** *Id.* at ¶ 18, at 1117.

**98.** *Id.* at ¶ 32, at 1118; *see also State ex rel. Okl. Bar Ass'n v. Prather,* 1996 OK 87, ¶ 17, 925 P.2d 28, 30.

**99.** *Wallace, supra* note 84, at 29, at 826; *Bolton, supra* note 9, at ¶ 12, at 602; *Donnelly, supra* note 8, at ¶ 14, at 546; *Colston, supra* note 8, at

¶ 20, at 925; *State ex rel. Okl. Bar. Ass'n v. Moss,* 1983 OK 104, ¶ 12, 682 P.2d 205, 207.

**100.** *State ex rel. Okl. Bar Ass'n v. Thomas,* 1995 OK 145, ¶ 14, 911 P.2d 907, 913–14.

**101.** *See* State ex rel. Okl. Bar Ass'n v. Busch, OBAD # 993.

**102.** *State ex rel. Okl. Bar Ass'n v. Busch,* 1992 OK 68, ¶ 13, 832 P.2d 845, 847 [*Busch I*].

**103.** *Busch II, supra* note 62, at ¶ 29, at 196–197.

**104.** *Busch III, supra* note 94, at ¶ 33, at 1120.

son and (b) that both the son and Busch were assigned separate duties in connection with Harker's bankruptcy. PRT Tr. at 917.

¶ 59   2)   **Exhibit 259** (7 October 1993 fax from plaintiff's attorney to Busch with attached 2–page journal entry of default judgment against Harker) was offered to show that under the doctrine of completeness, the journal entry of judgment should be admitted as pages 8 and 9 of Complainant's Exhibit 44 (Exhibit 44 is a copy of the petition filed in the Henthorne v. Harker lawsuit that was faxed to Busch on 7 October 1993) to show that Busch had received an earlier fax of the judgment which did not contain any allegations of embezzlement. PRT Tr. at 881–82.

¶ 60   3)   **Exhibit 268** (letter from Harker's son to the Oklahoma Tax Commission dated 30 November 1994 with attachments) was offered to show the planning that was done to assist Harker in her bankruptcy proceeding. PRT Tr. at 914.

¶ 61   4)   **Exhibits 68, 74** and **260** were offered to *rebut Harker's statement in her bar complaint* that after respondent had undertaken to resolve her dispute with her former employer she had no other contact with Busch until after the 4 August 1993 summons had been served on her. **Exhibit 68** (30 September 1992 letter from respondent to Harker) PRT Tr. at 875; **Exhibit 74** (letter from Harker to Busch received on 23 October 1992). PRT Tr. at 876; **Exhibit 260** (1 July 1992 fax cover letter from Harker to Busch with copy of tax information). PRT Tr. at 874.

¶ 62   5)   **Exhibits 261, 262** and **264** were offered to *rebut Harker's testimony that she met with Busch and delivered these materials.* These exhibits show that they were actually faxed to him. **Exhibit 261** (a fax cover sheet from Harker to Busch, dated 3 August 1993) was offered to show that the petition received by Harker was faxed to Busch's office on 3 August. PRT Tr. at 879; **Exhibit 262** (a fax cover sheet and attachment from Harker to Busch, dated 5 August 1993) was offered to show that Harker's husband on his wife's behalf faxed the summons to Busch. PRT Tr. at 875–880; **Exhibit 264**

(plaintiff's first request for admissions in Henthorne v. Harker) was offered to show the admissions received by Busch which was transmitted to Harker with handwritten notation showing a receipt date of 11 January 1994 and a response date of 8 February 1994. PRT Tr. at 899–990.

¶ 63   6)   **Exhibit 71** (19 January 1994 letter and bill from Busch to Harker) was offered to show that Busch (a) requested the admissions from Harker as well as (b) set out the payment schedule for his bill. PRT Tr. at 893, 897.

¶ 64   **B. COUNT TWO**

¶ 65   1)   **Exhibit 132** (unsigned mechanic's and materialmen's lien by Busch against Kish Resources for work performed on oil and gas leases owned by Kish, dated August 1992) was offered as part of respondent's proof in his case in chief. PRT Tr. at 644.

¶ 66   2)   **Exhibit 133** (an unsigned and undated mechanics' and materialmen's lien by Beverly Vassar dba BV Operating against Kish Resources for $32,800 for work performed on oil and gas leases) was offered as part of respondent's "case in chief." PRT Tr. at 645.

¶ 67   3)   **Exhibit 96** (letter from Kenny Smith to Kish Resources, attention of Pat Butler, dated 8 April 1992) was offered to show that on 14 March 1992 he received and reviewed the receivership and foreclosure lawsuit from Lee Levinson. PRT Tr. at 929.

¶ 68   4)   **Exhibit 100** (letter from Busch addressed "To Whom It May Concern", dated 29 April 1992) was offered to show that Boyer was taking over the operations of the Iron Post Field and to show that Busch had asked everyone cooperate with Boyer. PRT Tr. at 931.

¶ 69   5)   **Exhibit 116** (18 August 1992 letter from Busch to Tom Lee) was offered to show (a) that the only instruction Busch received about his legal services was to resolve the Kish/Houseco matter relating to the Iron Post field and (b) no other instructions had been given about his legal services in connection with the Palo Pinto Field or any other matter. PRT Tr. at 934.

¶70 6) **Exhibit 118** (letter from Busch to Tom Lee, dated 19 August 1992) was offered to show the wiring instructions for the payment of invoices faxed to Tom Lee on August 18 for operation of the Iron Post Field. PRT Tr. at 935.

¶71 7) **Exhibit 180** (23 April 1993 letter from Busch to Carl Royse) was offered to show that Busch had updated Royse on various matters, which included clearing up the titles on the Iron Post Lease. PRT Tr. at 950.

¶72 8) **Exhibit 187** (letter from John Woods, certified accountants, to Busch dated 13 May 1993) was offered to show that John Woods (auditors who had been instructed to audit Kish's financial statements for the period ended December 31, 1992) had asked Busch to forward all accounting records to them. PRT Tr. at 946.

¶73 9) **Exhibit 188** (13 May 1993 fax cover sheet from Busch to Garber along with copy of John Woods' 13 May 1993 letter) was offered to show that Busch had forwarded the letter to Garber asking for further instructions. PRT Tr. at 947.

¶74 10) **Exhibit 226** (15 December 1993 letter to Busch from Royse for Kish Resources USA) was offered to show that (a) Royse wanted to meet with Busch on 18 or 19 December 1993, (b) he indicated they would only have a short time together and (c) he requested a telephone number where he could reach Busch. PRT Tr. at 957–59.

¶75 11) **Exhibit 228** (3–page fax to Carl Royse from Busch) was offered to show his response to Busch's request to meet with Royse—that their time together would be limited. PRT Tr. at 962

¶76 12) **Exhibit 229** (20 December 1993 letter from Royse to Busch) was offered to show that the letter to Busch advised him that the Kish Board would be advised of the situation at the Iron Post Lease and that Royse would give Busch a reply as soon as he heard from the Board. PRT Tr. at 965.

¶77 13) **Exhibit 240** (undated letter from Beverly Vassar on Busch's stationary to Tom Lee) was offered to show that (a) Vassar had informed Tom Lee that the Iron Post lease was in jeopardy, (b) there were no funds, (c) the Creek County Corporation Commissioner was looking at the lease, (d) there were potential fines and (e) Vassar sought reimbursement to Busch for the money spent on the lease. PRT Tr. at 937.

¶78 14) **Exhibit 248** (list of equipment) was offered as a document that would speak for itself; and that would show (a) what equipment was on the different wells and (b) that the list was submitted to Vassar in the due course of operating the lease. PRT Tr. at 648–49.

¶79 15) **Exhibit 251**(affidavit of Kenny Rogers, a Tulsa lawyer) was offered to show that (a) while working as an associate of Bill House Rogers was asked to prepare document to effectuate the transfer of 50% of Houseco's holdings in the Iron Post lease and (b) later on he was asked by Butler if he could change some documents in order to circumvent some of the brokers in the deal. PRT Tr. at 924.

¶80 16) **Exhibit 269** (minutes of Kish Resources' PLC, dated 28 April 1993) was offered to show that Busch was working closely with Garber and that during the board meeting there was no discussion that Busch owed Kish any money. PRT Tr. at 945.

¶81 17) **Exhibit 88** (14 February 1992 letter from Lee Levinson to Butler) was offered to lay a predicate. Boarman's complaint [Count Two] alleges that Busch failed to preserve the Iron Post Lease. Respondent intends to establish that he did not lose anything, that it was their own conduct that caused them to lose the lease. PRT Tr. at 612.

¶82 The exclusion's correctness of items 1 through 6 in Count One and of items 1 through 17 in Count Two rests on our conclusion that the refused documents relate to the essential elements of respondent's defense or address themselves to anticipated proof by the prosecution. *Middlebrook, supra* note 29 at 582.

## CORRECTLY EXCLUDED DOCUMEN-TARY EVIDENCE FOLLOWED BY INSUFFICIENT PROFFER

¶ 84   COUNT TWO

¶ 85   1)   **Exhibit 95** (letter from Busch to Tom Lee, dated 4 April 1992) was offered as part of the offer of proof.   PRT Tr. at 632

¶ 86   2)   **Exhibit 102** (7 May 1992 letter to Busch from Tom Lee) was offered as part of the offer of proof.   PRT Tr. at 634

¶ 87   3)   **Exhibit 155** (10 January 1993 letter from Elroy (Carl) Royse to Busch)(identified as actually 10 January 1994) was offered by reading the text of the letter.   PRT Tr. at 966

¶ 88   4)   **Exhibit 231** (11 January 1994 letter from Henson to Busch) was offered by reading the text of the letter.   PRT at 967

¶ 89   5)   **Exhibit 232** (20 January 1994 fax from Busch to David Naylor) was offered by reading the text of the letter.   PRT Tr. at 968

¶ 90   6)   **Exhibit 233** (30 January 1994 letter from Busch to Kish Board) was offered by paraphrasing the content of the letter.   PRT Tr. at 970

¶ 91   7)   **Exhibit 234** (1 June 1994 letter from David Naylor to Royse) was offered to show that Naylor responded to Royse's December 22 fax; the text of the June 1 letter was read.   PRT Tr. at 971

¶ 92   8)   **Exhibit 241** (Boyer Activities) was offered as part of the offer of proof.   PRT Tr. at 636

¶ 93   9)   **Exhibit 242** (BV Operating Statement May–July) was offered as part of the offer of proof.   PRT Tr. at 638

¶ 94   10)   **Exhibit 245** (Expenses on Iron Post) was offered as part of the offer of proof.   PRT Tr. at 639

¶ 95   In the face of insufficient proffer we cannot test the correctness of the panel's exclusion.   *Crussel, supra* note 28 at 1118–19.

¶ 96   APPENDIX C

## CORRECTLY EXCLUDED TESTIMONI-AL EVIDENCE FOLLOWED BY SUFFICIENT PROFFER

¶ 97   1)   **Hondo Smith** (office manager for Busch)—he would testify about matters that respondent's *medical expert had earlier testified to* concerning (a) what was necessary for Busch to conduct business, (b) how that business is being conducted, (c) what changes have been made, (d) the present organization of Busch's office and (e) the manner in which he now conducts business.   He would testify that (a) when he went to work for Busch the filing system was in total disarray and files were scattered in numerous places, and (b) any delay in providing items to the Bar that were not provided was due to poor record keeping and filing.   His testimony would show what respondent has done since his May 1996 suspension to offset the problems which are similar to many of the allegations raised in the present proceedings.   PRT Tr. at 5–7, 869

¶ 98   2)   **Nellie Rine**—she would testify about the organization of Busch's files' and that they had to be completely reorganized.   PRT Tr. at 869

¶ 99   The exclusion's correctness of items 1 through 2 rests on our conclusion that the rejected testimony relates to the essential elements of respondent's defense.   *Middlebrook, supra* note 29 at 582.